UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
:
YIQING HAN, YIYAN ZHANG and :
ZHONGYI PEI, :       Civil Action No.
:
Plaintiffs, :
:
-against- :       **COMPLAINT**
:
LI LI and L&H RESORT SYSTEMS, LP, :       **TRIAL BY JURY DEMANDED**
:
Defendants. :
-------------------------------------------------------------X

  1.  Plaintiffs Yiqing Han ("Han"), Yiyan Zhang ("Zhang"), and Zhongyi Pei ("Pei"),

by their attorneys Dorsey & Whitney LLP, complaining of Defendants Li Li ("Li") and L&H

Resort Systems, LP ("L&H"), allege as follows:

**THE PARTIES**

  2.  Plaintiff Han is a business investor and a citizen of China.  He is a U.S. permanent

resident and maintains a residence in the State of New York.

  3.   Plaintiff Zhang is a business investor, a citizen and resident of China, who

maintains a residence in the State of New York.

  4.  Plaintiff Pei is a business investor, a citizen and resident of China and does not

maintain a residence in the United States.

  5.  Defendant Li is a resident of the State of New York and resides in Queens.

  6.  Defendant L&H is a limited partnership organized and existing under the laws of

the State of Delaware and is authorized to conduct business in the State of New York.

**JURISDICTION AND VENUE**

  7.  This Court has jurisdiction over the claims for relief arising under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961, *et. seq*., pursuant to

18 U.S.C. § 1964(c) and has supplemental jurisdiction arising over the claims for relief arising under New York law pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the Eastern District of New York pursuant to 18 U.S.C. § 1965(a) because it is a district in which the Defendant Li resides and the Defendant L&H is headquartered.

## COUNT I

## RACKETEERING

9.      This is an action against each of the Defendants for a violation of 18 U.S.C. § 1962(c).

10.     From in or about March 2011, and through June 2016, the Defendants and others known and unknown to Plaintiffs, who were employed by and associated with the enterprise pleaded below, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the enterprise through a pattern of racketeering activity, which included an act involving bribery, which is chargeable under New York Penal Law § 180.03 and is punishable by imprisonment for more than one year, and acts indictable under 18 U.S.C. § 1341 (relating to wire fraud), § 1343 (relating to mail fraud), § 1956 (relating to the laundering of monetary instruments), and §§ 2314 and 2315 (relating to interstate transportation of stolen property).

**I.      The Enterprise**

11.     During the course of the pattern of racketeering activity, the Defendants Li and L&H, along with Eiffel Resort & Convention LLC;  Landco H & L, Inc.; La Mare Win LLC; Lin Qi; Randy Chang ("Chang"), and others unknown to Plaintiffs, joined together as a union or group of individuals, associated in fact although not a legal entity, for the common purpose of

defrauding, cheating and tricking the Plaintiffs into providing their funds for a resort in Catskill, New York known as the Friar Tuck Inn.  In truth and in fact, the Defendants, motivated by avarice and greed, used self-dealing and fraud to convert Plaintiffs' so-called investments to their own financial benefit to line their own pockets.

12.     The Defendant Li was the ringleader and organizer of the association-in-fact enterprise.  Lin Qi, an acquaintance of the Plaintiff Han, reached out to Han and introduced him to Li for the purpose of ensnaring him and the other Plaintiffs in the fraud.  Li, with the assistance of the lawyer Chang, created the Defendant L&H to provide an aura of legitimacy to the project.  Li used Eiffel Resort & Convention LLC and Landco H & L, Inc. to launder and conceal from the Plaintiffs the fact that the Plaintiffs' funds were being diverted and used for Li's own benefit.  Moreover, Li used funds defrauded from Plaintiffs to purchase additional property adjacent to the Friar Tuck Inn.  Li used La Mare Win LLC as a vehicle to do so and to deny Plaintiffs their rightful ownership interest in that additional property.

## II.     The Pattern of Racketeering Activity

13.     It was an object of the pattern of racketeering activity that the Defendants and others, known and unknown to the Plaintiffs, would devise schemes and artifices to defraud and for obtaining money.  Moreover, the Defendants and others, known and unknown to the Plaintiffs, actually did defraud the Plaintiffs of approximately $4,900,000 by means of false and fraudulent pretenses, representations and promises, as particularized below, in violation of the criminal mail fraud statute, 18 U.S.C. § 1341, and they executed such schemes by causing funds and documents to be sent through the U.S. Postal Service or a private or commercial and interstate carrier as further particularized below and in violation of the criminal wire fraud statute, 18 U.S.C. § 1343, and they also executed such schemes by causing funds to be transmitted to the Defendants in interstate and foreign commerce as further particularized

below.

14.     It was a further object of the pattern of racketeering activity that the Defendants and others, known and unknown to the Plaintiffs, caused money of the value of $5,000 or more to be transported, transmitted and transferred in interstate and foreign commerce, knowing the same to have been converted and taken by fraud in violation of Title 18, U.S.C. § 2314, as further particularized below.

15.     It was a further object of the pattern of racketeering activity that the Defendants and others, known and unknown to the Plaintiffs, received, possessed and concealed stolen money of the value of $5,000 or more, which crossed a State and United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted and taken in violation of Title 18, U.S.C. § 2315, as further particularized below.

16.     It was a further object of the pattern of racketeering activity that the Defendants and others, known and unknown to the Plaintiffs, committed an act involving bribery chargeable under State law, to wit, New York Penal Law § 180.03, punishable by imprisonment for more than one year, as further particularized below.

17.     It was a further object of the pattern of racketeering activity that the Defendants, and others, known and unknown to the Plaintiffs, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to wit, mail fraud, wire fraud, interstate theft and state bribery, conducted and attempted to conduct such financial transactions, which in fact involved the proceeds of aforementioned unlawful activity knowing that the transactions were designed in whole or in part to conceal or disguise the control of the proceeds of the aforementioned unlawful activity in violation of Title 18, U.S.C. § 1956(a)(1)(B)(i).

III.    **The Defendants' Fraud to Induce the Plaintiffs to Purchase the Friar Tuck Inn**

18.    From on or about February 1, 2011, to on or about July 20, 2011, the Defendants

engaged in a scheme to defraud the Plaintiffs of their funds to purchase property.

19.    The Plaintiffs Han, Zhang, and Pei are Chinese nationals with limited or no ability

to speak, write and read English, and, as a result, the Defendant Li took advantage of their lack

of understanding of the English language and the U.S. system of law to lure them into parting

with their funds for what she described as an investment in the Friar Tuck Inn.  The Friar Tuck

Inn was a property in mortgage foreclosure, in Greene County, New York.

20.    In or about February 2011 the Plaintiff Han was introduced to the Defendant Li

by Lin Qi who explained to Han that Li had some investment projects that might interest Han as

an investor.

21.    In furtherance of this scheme to defraud, in or about February and early March

2011, the Defendant Li made the following false, fictitious and fraudulent representations about

the viability of the Friar Tuck Inn as an investment:

a.    The Friar Tuck Inn could be used as a gambling casino or for off-track

betting, and that it already had a license for off-track betting.  After the

closing for the purchase of the Inn, the Plaintiff Han again asked Li about

the license for off-track betting.  Li falsely stated that the off-track betting

license had been cancelled after the Inn went into foreclosure but that they

could renew the license if they wanted to.

b.    The property could be mortgaged for $17 million but that it could be

purchased for substantially less because of her personal connection with

the bank.  Together with costs and other fees, Li said they would need to

come up with $7 million to take over the Friar Tuck Inn, when in truth and

in fact, the Defendant Li knew that the Friar Tuck Inn had supposedly been sold for $4.5 million in an auction in 2009, but the money never materialized.  Li also knew that the property was being offered at a price substantially less than the current mortgage on the property of $3.5 million and in fact the property was contracted for sale two months later for approximately $2.4 million.

22.     Relying on these misrepresentations, in or about March 2011 the Plaintiff Han recruited the Plaintiff Zhang as an additional investor to purchase the Friar Tuck Inn, and during the first week of March 2011 Han and Zhang met with the Defendant Li who repeated to them the same misrepresentations about the Inn's financial potential as alleged in paragraph 21 above, including the misrepresentation that the Inn could be used as a gambling casino or for off-track betting.

23.     On or about March 9, 2011, the Plaintiff Zhang returned to China and told the Plaintiff Pei about the investment.

24.     In or about mid-April 2011, the Defendant Li accompanied the Plaintiffs Han and Zhang on a tour of the Friar Tuck Inn and repeated to them the same misrepresentations about the Inn's potential as alleged in paragraph 21 above, again emphasizing how the Inn could be used as a gambling casino and for off-track betting.

25.     On or about May 4, 2011, the Defendant Li emailed the Plaintiff Han an aerial photo of the Friar Tuck Inn with a description falsely stating that the asking price was $15 million, when in truth and in fact, the filing in the Bankruptcy Court for the Northern District of New York, dated September 2, 2009, listed the value of the property as $1,705,500 with liabilities of $1,200,050.  With reference to this email, Li falsely represented to Han that she had

contacts at the bank that held the mortgage on the Inn and that she was in a position to be able to purchase the Inn for a lower price.

26.     On or about May 23, 2011 and thereafter, the Defendant Li did not disclose to any of the Plaintiffs that on May 23, 2011, Atlantic Finance LLC ("Atlantic Finance") had entered into a sales contract with the Ulster Savings Bank to purchase the Friar Tuck Inn.  This fraudulent omission of fact was material because on or about July 20, 2011, undisclosed to any of the Plaintiffs, Li paid Atlantic Finance $324,110 to purchase the assignment of the sales contract, and Atlantic Finance is associated with members of the Luchese La Cosa Nostra crime family.  Atlantic Finance is owned by George Fakiris, who pled guilty in 1993 to mail fraud and was barred from doing business with New York City.  A city Department of Investigation report states that Fakiris admitted that "he made cash payments to Pete Chiodo of the Luchese crime family."  Li secretly arranged the signing of documents agreeing to this assignment with Atlantic Finance without ever informing the Plaintiffs.  Li signed the documents agreeing to the assignment on June 28, 2011, and July 20, 2011.  However, rather than sign the document in her own name, Li signed the June 28, 2011 document over the printed name of the Plaintiff Pei as General Partner of L&H.  In this way, Li created the false and fraudulent misimpression that Pei had signed the document.  In fact, Li never informed any of the Plaintiffs of the existence of this document.  Li likewise never informed any of the Plaintiffs that Li had fraudulently used Plaintiff Pei's name to sign an assignment agreement with a company connected to the Luchese La Cosa Nostra crime family.  The July 20 document is signed by Li as General Partner.  Yet the signatures on the July 20 and June 28 documents are the same signatures notwithstanding the fact that Li admitted to a notary that the July 20 signature is her own, and she falsified the June 28 document to make it appear it was signed by Pei.

27.     In or about mid-June 2011, the Plaintiff Pei travelled from China to the United States to meet the Defendant Li and toured the Friar Tuck Inn with the Plaintiffs Han and Zhang, during which time Li repeated to the Plaintiffs the same misrepresentations about the Inn's potential as alleged in paragraph 21 above, again emphasizing how the Inn could be used as a gambling casino and for off-track betting.

28.     In furtherance of this scheme to defraud, on or about June 22, 2011, the Defendant Li, aided and abetted by her attorney, Chang, who claimed to represent all the partners, created a partnership agreement in the name of Defendant L&H for the purchase of the Friar Tuck Inn, which agreement Li never intended to honor.  The total amount of capital represented in the agreement was $7 million, the same amount that Li falsely told the plaintiffs was needed for them to take ownership of the Friar Tuck Inn.  In order to induce the Plaintiffs to sign the partnership agreement, Chang and Li arranged to have the partnership agreement translated to the Plaintiffs in a way that emphasized that Li was obligated to make a capital contribution into the partnership equal to her percentage interest in the partnership.  In fact, the partnership agreement listed the Plaintiff Zhang with a 16% share in the partnership for a capital investment of $1.12 million (*i.e.*, 16% of $7 million), the Plaintiff Han with a 16% share in the partnership for a capital investment of $1.12 million, and the Plaintiff Pei with 50% share for a capital investment of $3.5 million.  Li was designated with an asterisk requiring her "to invest the market value of the property" for an 18% share.  Both Chang and Li verbally told the Plaintiffs that this language required Li to invest funds equal to her percentage ownership of the property, which is 18% of $7 million, or $1,260,000.  This representation was consistent with what Li promised the Plaintiffs previously, namely that she was willing and able to contribute the $1,260,000 in order to induce them into joining the partnership.

29.     On or about June 22, 2011, the Plaintiffs signed the partnership agreement in the lawyer Chang's Manhattan office.  Defendant Li and Chang misled the Plaintiffs as to the contents of the agreement by having a purportedly neutral translator translate the partnership agreement from English to Chinese.  In fact, the translator Ms. Xiong was Chang's mother, although Li and Chang concealed this fact from the Plaintiffs until a year later.  Prior to the signing of the partnership agreement, the Plaintiffs told Li that they would not enter into the partnership agreement and buy the Friar Tuck Inn unless she agreed to contribute an 18% share of the $7 million or $1.26 million.  To induce the Plaintiffs into providing their funds, Li falsely stated that she would contribute the $1.26 million.  Ms. Xiong deliberately told the Plaintiffs that the partnership agreement stated that Li was required to make a capital contribution equivalent to her percentage interest in the partnership.  Li never before the purchase of the Inn or afterwards paid the $1.26 million into the partnership accounts.

30.     In purporting to detail to the Plaintiffs the funds needed to purchase the Friar Tuck Inn, the Defendant Li, in a corrupt effort to bilk the Plaintiffs of as much money as possible, falsely stated to the Plaintiffs that there was a $200,000 penalty amounting to $100,000 for each of two instances when they postponed the closing date on the purchase of the Inn.  In truth and in fact, Li never provided proof of the purported bank penalties even though the Plaintiffs repeatedly requested proof of such penalties, and the bank's closing statement does not reflect the payment of any such penalties.  The closing statement from the Ulster Savings Bank does not reflect a $200,000 penalty as part of the sales price.  The bank never imposed any such penalties, and Li lied about these penalties as an excuse to steal money from the partnership trust account.

31.     On or about July 20, 2011, the Defendant Li purchased the Friar Tuck Inn for

$2.45 million, even though she falsely represented to the Plaintiffs that it would require a total of $7 million to complete the purchase.

32.     In furtherance of this scheme to defraud, the Defendants caused the following bank wires on or about the dates set forth from the individual Plaintiffs in the approximate amounts to be transmitted in interstate and foreign commerce from banks in China to bank accounts in New York:

|   | Approximate Date | Plaintiff | Amount |
|---|---|---|---|
| 1 | July 4, 2011 | Zhongyi Pei | $100,000 |
| 2 | July 6, 2011 | Zhongyi Pei | $200,000 |
| 3 | July 18, 2011 | Yanyi Zhang | $200,000 |
| 4 | July 19, 2011 | Yiqing Han | $118,000 |
| 5 | July 19, 2011 | Yiqing Han | $512,000 |
| 6 | July 19, 2911 | Yiqing Han | $370,000 |
| 7 | July 20, 2011 | Zhongyi Pei | $50,000 |
|   | **Total** | | **$1,550,000** |

## IV.     The Defendants' Fraud to Scam the Plaintiffs for Additional Funds after the Purchase of the Friar Tuck Inn

33.     In furtherance of this scheme to defraud, on or about July 21, 2011, the Defendant Li falsely told the Plaintiffs that they owed her approximately $450,000 for a personal loan she claimed to have taken out in order to have sufficient funds for the purchase of the Friar Tuck Inn.  Li also falsely told the Plaintiffs that she had to mortgage her sister's home as collateral for this loan.  In truth and in fact, the opposite was true: namely, she used the Inn as collateral for a $474,110 loan from Atlantic Finance on July 20, 2011 without disclosing that fact to the Plaintiffs.  As noted in paragraph 26, Atlantic Finance is associated with members of the Luchese La Cosa Nostra crime family.  Even after fully repaying the loan from Atlantic Finance, Li continued to request the Plaintiffs to wire more money for her falsely stated purpose of paying back her sister's mortgage loan, when in fact the sister's home was never mortgaged

as collateral for the Friar Tuck Inn.

34.     As a means to bilk more funds from the Plaintiffs, on or about July 25, 2011, five days after the July 20, 2011 closing on the purchase of the Friar Tuck Inn, the Defendant Li falsely told the Plaintiffs that the Ulster Savings Bank continued to hold title to the Inn. Defendant Li falsely claimed that the Ulster Savings Bank continued to hold title to the Inn because Li and the Plaintiffs had only partially paid the bank the full sales price of the Inn.  In truth and in fact, Greene County records reflect that full title did pass from the Ulster Savings Bank to the Defendant L&H on July 20, 2011.  On or about July 25, 2011, Li falsely told the Plaintiffs that she needed to pay the Ulster Saving Bank $470,000 to release the title to the partnership.  As a result, the Plaintiffs were scammed into making further payments to the partnership, as detailed below in paragraph 35.

35.     After the purchase of the Friar Tuck Inn, the Defendant Li asked the Plaintiffs to fund an additional $350,000 to pay off a loan in order to get the bank to release the deed to the Inn.  At Li's direction, the Plaintiff Pei wired an additional $350,000 on July 22 and 26, 2011 to a bank account in the name of Landco H & L, Inc., an account controlled solely by Li.  Li falsely claimed that the funds needed to be wired to the Landco H & L, Inc. bank account based upon the pretext that the partnership account had not yet been opened.  Bank records show Li used funds in Landco H & L, Inc.'s bank account for her personal expenses, including payments to her sister and expenses for Li's other projects unrelated to the Friar Tuck Inn.

36.     After Hurricane Irene in August 2011, the Defendant Li, in a corrupt effort to steal and swindle additional funds from the Plaintiffs, falsely exaggerated to the Plaintiffs the scope of the damage caused by Hurricane Irene to the Friar Tuck Inn.  While the evidence of this fraud is peculiarly in the knowledge and possession of Li and will be further revealed in

discovery, the Plaintiffs are aware of one such instance where Li falsely told the Plaintiffs that the damage to the swimming pool at the Inn had cost $600,000 to repair, when bank records produced in a subsequent action in New York Supreme Court showed that on November 4, 2012, only $150,000 had been spent on repairing the pool.

37.     In or about December 2011, the Plaintiffs, relying upon the Defendant Li's repeated falsehood that the bank still held title to the Friar Tuck Inn because the full purchase price for the Inn had not been delivered to the bank, sent a letter to the lawyer Chang stating that they no longer wanted to be buyers of the Inn.  The Plaintiffs further requested that their moneys paid to the bank be refunded.  Li falsely told the Plaintiff Han that they could return the Inn to the bank and get their funds fully refunded upon each submitting an executed withdrawal agreement.  Relying on Li's representation, the Plaintiffs Pei and Zhang signed the withdrawal agreements and sent them to Han because Li told the Plaintiffs that she would submit the withdrawal agreements to the bank on their behalf.  Han did not sign a withdrawal agreement because Li told him that, unlike Pei and Zhang who were then living in China and could not go to the bank, they (meaning Li and Han) could sign their withdrawal agreements at the bank. That never happened because the bank, which had previously had a mortgage on the property, no longer had an interest in the property, contrary to the false representations made by Li.

38.     In or about early 2014, after the Defendant Li refused to provide the Plaintiffs with documentation detailing the exact payment made for the purchase of the Friar Tuck Inn, the Plaintiff Han attempted to obtain the closing documents from the lawyer Chang.  Chang was the lawyer who drafted the partnership agreement and who purported to simultaneously represent all the partners.  Chang refused to provide the requested closing documents to Han. Chang stated that he could not provide the documents because he had a separate, secret

agreement with Li, and further stated that he could not provide any documents to Han or the others without Li's permission. While Chang acknowledged that he was the lawyer for Han as well as Li, Chang continued to insist that he could not provide any documents to Han without Li's authorization, and that Han would instead need to obtain the information from Li or ask Li to grant authorization for release of documents. Chang used his position as a lawyer to trick Han into believing he did not have a legal right to the closing documents, which would have revealed Li's fraud. In fact, Chang and Li had entered into their secret side agreement for the purpose of defrauding the Plaintiffs by withholding critical documents and misleading the Plaintiffs into believing they had no legal right to those documents. Subsequently, Han asked Li for the closing documents, but Li ignored his request.

39.     In or about December 2011, the Defendant Li told the Plaintiff Han that a parcel of land adjacent to the Friar Tuck Inn (the "Nottingham property") was for sale and would be added to the land currently owned by the partnership. Li falsely told Han that the purchase price was at least $80,000. Relying on this falsehood, on or about December 16, 2011, Han wrote two checks, totaling $80,000, made payable to Eiffel Resort & Convention LLC's account as deposit for purchase of the Nottingham property. In August 2013, Li told Han that they needed to pay property tax on the Nottingham property or it would be foreclosed. In reliance on Li's representation, Han paid at least $100,000 to Eiffel Resort & Convention LLC for property tax. Records from the Municipality of Catskill reflect that Li's statements were total fabrications and lies, and that there were three parcels of land purchased on December 5, 2013 for only $15,000, long after Li's requests for funds on these parcels. Moreover, records from the Municipality of Catskill show that these parcels were not purchased in the name of the partnership but were purchased by La Mare Win, LLC, a corporation solely owned and

controlled by Li.

40.     In furtherance of the fraud and theft of the Plaintiffs' funds that continued after the closing of the purchase of the Friar Tuck Inn, the Defendants caused the following bank wires on or about the dates and in the approximate amounts set forth in interstate and foreign commerce from banks in China to bank accounts in New York:

|     | Approximate Date | Plaintiff | Amount |
| --- | --- | --- | --- |
| 1 | July 22, 2011 | Yiqing Han | $250,000 |
| 2 | July 22, 2011 | Zhongyi Pei | $250,000 |
| 3 | July 26, 2011 | Zhongyi Pei | $100,000 |
| 4 | August 5, 2011 | Zhongyi Pei | $51,000 |
| 5 | August 9, 2011 | Zhongyi Pei | $50,000 |
| 6 | August 9, 2011 | Zhongyi Pei | $50,000 |
| 7 | August 9, 2011 | Zhongyi Pei | $50,000 |
| 8 | August 23, 2011 | Zhongyi Pei | $50,000 |
| 9 | August 23, 2011 | Zhongyi Pei | $50,000 |
| 10 | October 27, 2011 | Yiqing Han | $100,000 |
| 11 | April 16, 2012 | Zhongyi Pei | $50,000 |
| 12 | April 16, 2012 | Zhongyi Pei | $50,000 |
| 13 | April 17, 2012 | Zhongyi Pei | $50,000 |
| 14 | May 9, 2012 | Zhongyi Pei | $50,000 |
| 15 | July 2, 2012 | Zhongyi Pei | $10,000 |
| 16 | July 27, 2012 | Zhongyi Pei | $20,000 |
| 17 | August 10, 2012 | Zhongyi Pei | $20,000 |
| 18 | August 20, 2012 | Zhongyi Pei | $27,818 |
| 19 | August 20, 2012 | Zhongyi Pei | $25,000 |
| 20 | September 17, 2012 | Zhongyi Pei | $25,000 |
| 21 | September 27, 2012 | Zhongyi Pei | $50,000 |
| 22 | October 31, 2012 | Zhongyi Pei | $50,000 |
| 23 | October 31, 2012 | Zhongyi Pei | $50,000 |
| 24 | October 31, 2012 | Zhongyi Pei | $50,000 |
| 25 | November 20, 2012 | Zhongyi Pei | $49,985 |
| 26 | November 20, 2012 | Zhongyi Pei | $49,985 |
| 27 | November 27, 2012 | Zhongyi Pei | $49,985 |
| 28 | December 10, 2012 | Zhongyi Pei | $50,000 |
| 29 | December 10, 2012 | Zhongyi Pei | $50,000 |
| 30 | December 10, 2012 | Zhongyi Pei | $50,000 |
| 31 | November 25, 2013 | Zhongyi Pei | $11,000 |
| 32 | January 2, 2014 | Zhongyi Pei | $50,000 |

| | Approximate Date | Plaintiff | Amount |
|---|---|---|---|
| 33 | July 1, 2015 | Zhongyi Pei | $303,096.63 |
| | **Total** | | **$2,192,870** |

41.     In addition to the payments referenced in paragraph 40, the Plaintiff Han

continued to make payments for the upkeep of the Friar Tuck Inn.  For example, Han paid taxes,

salaries to the resort workers, as well as purchased various equipment and commodities

necessary for the maintenance of the Friar Tuck Inn, including a boomlift, a generator, lawn

mower and gas. The total amount of these expenses was at least $59,000.

**V.     The Defendants' Money Laundering Scheme**

42.     On or about July 22, 2011, approximately a month after the Plaintiffs signed the

partnership agreement for the Defendant L&H, the Defendants opened a bank account in the

name of the partnership at United International Bank in Flushing, New York with the Defendant

Li and the Plaintiff Han listed as signatories with access to the account.  In or about October or

November 2011, Li unilaterally closed L&H's United International Bank account, and moved

the funds therein, without informing the Plaintiffs.

43.     On or about August 8, 2011, in a corrupt effort to conceal the Defendants' control

of the proceeds of her mail and wire fraud schemes and her theft of the Plaintiffs' funds, and

also to conceal that the Defendants would be spending the Plaintiffs' funds on matters unrelated

to the Friar Tuck Inn, the Defendant Li opened an account in the name of Eiffel Resort &

Convention LLC at JP Morgan Chase.  In doing so, Li did not provide any of the Plaintiffs

signatory authority over the account to write checks or review the account.  As part of her

scheme to defraud and launder the Plaintiffs' funds to conceal the Defendant Li's sole control

over the funds and her misuse of those funds for purposes other than the Friar Tuck Inn, Li

concocted a false excuse that because the Inn was held in the name of the Defendant L&H, it

was necessary to have another company, Eiffel Resort & Convention LLC, operate and manage the property.

44.     Beginning on or about August 8, 2011, Li directed the Plaintiffs to deposit their funds, the proceeds of the Defendants' unlawful activity, in the Eiffel Resort & Convention LLC's account as set forth in paragraph 43 above.  The Defendants never provided the Plaintiffs any bank statements or cancelled checks from that account until those documents were produced in the action in the New York State Supreme Court, New York County, Index No. 651909/2014 (the "State Action"), despite repeated prior requests from the Plaintiffs.  In fact, Plaintiffs would renew their requests for the records at each of the four annual meetings they had from 2011 through 2014, but Li rebuffed all their requests.

45.     As stated in paragraph 43 above, the Defendant Li stole the partnership funds for purposes other than the Friar Tuck Inn. In fact, the Eiffel Resort & Convention LLC's bank account records show that Li looted and diverted the Plaintiffs' funds to her own benefit, including by spending the funds on projects unrelated to the Friar Tuck Inn and for personal expenses, including but not limited to, legal fees of $7,500 to a divorce attorney in Carle Place, New York; $4,000 loan to her company, Landco H & L, Inc.; multiple loan payments to T.M.C.C., which appear to be car payments to Toyota Motor Credit Company, and a $1,004.50 cash withdrawal at Foxwoods Resort Casino in Connecticut.

46.     The Defendants caused bank wires and/or deposits into the Eiffel Resort & Convention LLC account as set forth in paragraph 40, *supra*, rows 10 through 33, in addition to the following:

|   | Approximate Date | Plaintiff | Amount |
|---|---|---|---|
| 1 | December 16, 2011 | Yiqing Han | $20,000 |
| 2 | December 16, 2011 | Yiqing Han | $60,000 |
| 3 | February 8, 2012 | Yiqing Han | $50,000 |

|   | Approximate Date | Plaintiff | Amount |
|---|---|---|---|
| 4 | August 18, 2012 | Yiqing Han | $3,000 |
| 5 | June 23, 2013 | Yiqing Han | $20,000 |
| 6 | September 9, 2013 | Yiqing Han | $10,000 |
| 7 | September 11, 2013 | Yiqing Han | $5,000 |
| 8 | November 18, 2013 | Yiqing Han | $2,000 |
| 9 | November 18, 2013 | Yiqing Han | $2,000 |
| 10 | January 22, 2014 | Yiqing Han | $2,000 |
|   | **Total** |  | **$174,000** |

**VI.    The Defendants' Scheme to Defraud the Plaintiffs in the State Action**

47.    From in or about June 2014, up until the filing of this complaint, the Defendants engaged in a scheme to continue to defraud the Plaintiffs of their funds in a lawsuit brought by the Plaintiffs Pei and Zhang against the Defendants in the State Action.  The Plaintiffs Zhang and Pei brought the action to seek an accounting of the partnership account, including payments made to acquire the Friar Tuck Inn, as well as to recover the funds they had provided to the Defendants.

48.    In furtherance of the Defendants' scheme to defraud, on or about June 27, 2016, the Defendants knowingly and corruptly caused approximately seventeen checks to be produced in discovery through the Postal Service that were doctored and changed to make it appear that the checks were used for legitimate expenses relating to the Friar Tuck Inn.  The Defendants fraudulently changed certain of the check notations containing addresses of other real estate projects to instead refer to "4858 Rt 32," the address for the Friar Tuck Inn.  Moreover, the Defendants changed the check notations to make it falsely appear that the checks were used for expenses for handling "problems" at the Friar Tuck Inn, and for consulting fees, processing fees, loan repayments, legal fees, and brokerage fees connected to the Friar Tuck Inn.  In truth and fact, these checks were used for the personal benefit of the Defendant Li and for her other

real estate projects.  For example, the authentic checks subpoenaed from the bank show Li used the partnership funds to pay for other ventures, her own continuing education class, for maintaining her real estate license, and for paying attorney fees and brokerage fees for real estate projects unrelated to the operation of the Friar Tuck Inn.  Those checks are described below by date, check number, actual notation on the check and the false, fictitious and fraudulent notation created by Li:

| | Date | Check Number | Payee | Actual Check Notation | Fraudulent Notation | Amount |
|---|---|---|---|---|---|---|
| 1 | December 30, 2011 | 1045 | Li Li | #52 Week | [blank] (hiding the fact that Li was paying herself a weekly salary not disclosed to the Plaintiffs) | $3,000.50 |
| 2 | December 30, 2011 | 1046 | Ling Guo | Gou Lin [Guo Ling] close 140 Russell LLC | Gou Lin 质询 [Consulting] fee | $550.00 |
| 3 | January 2, 2012 | 1047 | Landco H & L Inc. | Eiffel Sprinkler Test, Repair | Loan Paid Back | $3,000.00 |
| 4 | February 8, 2012 | 1052 | Queen Jane's Spa | Returns for the job 37 E 23St Terminated Job NYC. NY. | Returns 欠 的 [owed by] 4858 Rt 32 | $1,000.00 |
| 5 | February 14, 2012 | 1053 | DOB | 4040 | 手续费 [Processing fees] 4858 | $419.50 |
| 6 | February 14, 2012 | 1054 | DOB | Permit 2950 U | Fees 4858 Consultant | $165.00 |
| 7 | February 15, 2012 | 1137 | DOB | 817 Fried pl Bk Jean Yao | 4858 质询 [Consulting] Fee | $324.35 |
| 8 | February 15, 2012 | 1138 | DOB | 11-17 47R PAA 改图 [Amend | 4858 质询 [Consulting] 麻 | $100.00 |

|  | Date | Check Number | Payee | Actual Check Notation | Fraudulent Notation | Amount |
|---|---|---|---|---|---|---|
|  |  |  |  | floorplan] | 烦 [Problem] |  |
| 9 | February 15, 2012 | 1139 | Yao Liming | 817 + 11-17 47 的 PAA 图, YAO [floor plan(s) of 817+11-17 47] | 4858 Rt 32 质询 [Consulting] | $300.00 |
| 10 | February 16, 2012 | 1056 | YBLNY Inc. | LYB 4428 65Ave HAVC | LYB 4858 Road 32 问 [Problem(s)] | $2,000.00 |
| 11 | February 23, 2012 | 1057 | DOB | 4040 College Point Alt 1 Filing Fee | 大麻烦 [Big trouble] 4858 问 [Problem(s)] | $776.80 |
| 12 | February 23, 2012 | 1058 | Yao Liming | 4040 College Point Alt 1 Filing Fee | 质询 [Consulting] 4858 Rt 32 问 [Problem(s)] | $200.00 |
| 13 | March 8, 2012 | 1092 | IBG | Return Loan 140 | Return Loan | $60,000.00 |
| 14 | May 3, 2012 | 1076 | Luis Morrison | Broker Fee | Broker Fee + Consultant | $10,000.00 |
| 15 | July 16, 2012 | 1108 | Marvin Evan | 102-14 Lewis 律师费 [Attorney's fees] | Lewis 律师费 [Attorney's fees] | $1,470.00 |
| 16 | August 8, 2012 | 1111 | American Real Estate Institute | C/E Training + Broker Li | C/E Training + Broker | $330.00 |
| 17 | October 31, 2012 | 1006 | Hodgson Russ | TAM Attorney Fee | Attorney Fee | $10,000.00 |

49.     On or about June 27, 2016, the Defendants, through their attorney in the State Action, caused the above-listed checks with false, fraudulent and fictitious markings to be sent and delivered to the Plaintiffs through the Postal Service.

### VII.   Act of Bribery Chargeable by State Law

50.     On or about November 7, 2014, the Defendant Li, in a corrupt effort to support her false position in the State Action that she had paid $3,500,000 for the Friar Tuck Inn and did not use the Plaintiffs' funds for her own personal benefit, offered the Plaintiff Han $500,000 as a cash bribe in violation of New York Penal Law § 180.03, if he would corroborate her false story in the State Action.  Li offered Han $500,000 in exchange for falsely telling Plaintiffs Zhang and Pei that Li had paid a $700,000 brokerage fee for the purchase of the Friar Tuck Inn, and also that this fictitious payment was part of the $3,500,000 Li falsely claimed to have spent on purchasing the Inn.  In truth and in fact, the purchase price for the Inn was $2,425,000 and there was no $700,000 brokerage fee.

### VIII.   Damages

51.     As a direct and proximate result of the Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business and property as described above.

WHEREFORE, the Plaintiffs demand judgment against each of the Defendants, jointly and severally, and in its favor for:

A.   Compensatory and other damages contemplated by and available through 18 U.S.C. § 1964(c) for damages actually sustained in the amount of at least $5,000,000;

B.   Threefold the actual damages sustained;

C.   The costs of suit and reasonable attorneys' fees; and

D.   Such other relief as the Court deems just.

### COUNT II

### RICO VIOLATIONS OF § 1962(d)

52.     The Plaintiffs reallege and incorporate herein by this reference the allegations in

paragraphs 1 through 51, as if set forth fully herein.

53.    From in or about March 2011 to the present, the Defendants, together with others known and unknown, unlawfully, willfully, and knowingly conspired, combined and agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise pleaded in paragraphs 9 – 50 above, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

54.    In furtherance of this conspiracy the Defendants and others, known and unknown to the Plaintiffs, committed numerous overt acts as alleged above in the pattern of racketeering in paragraphs 13 through 50.

55.    As a direct and proximate result of the Defendants' wrongful actions described herein, the Plaintiffs have sustained actual damages as described above.

WHEREFORE, the Plaintiffs demand judgment against each of the Defendants, jointly and severally, and in its favor for:

A.  Compensatory and other damages contemplated by and available through 18 U.S.C. § 1964(c) for damages actually sustained in the amount of at least $5,000,000;

B.  Threefold the actual damages sustained;

C.  The costs of suit and reasonable attorneys' fees; and

D.  Such other relief as the Court deems just.

## COUNT III

## CONVERSION

56.    The Plaintiffs reallege and incorporate herein by this reference the allegations in paragraphs 1 through 55, as if fully set forth herein.

57.    This is an action against the Defendants for their joining, collective and independent actions to unlawfully convert money and funds belonging to the Plaintiffs.

58. Despite the Plaintiffs' ownership of their funds, the Defendants knowingly, dishonestly, and intentionally defrauded and stole money and funds belonging to the Plaintiffs.

59. The Defendants' actions constitute a knowing, unlawful, and intentional conversion of the Plaintiffs' funds and money.

60. As a direct and proximate result of the Defendants' wrongful actions described herein, the Plaintiffs have sustained actual damages as described above.

WHEREFORE, the Plaintiffs demand judgment against each of the Defendants, jointly and severally, and in its favor for:

    A. Compensatory and other damages contemplated for damages actually sustained in the amount of at least $5,000,000;

    B. Punitive damages; and

    C. Such other relief as the Court deems just.

## COUNT IV

## FRAUD

61. The Plaintiffs reallege and incorporate herein by this reference the allegations in paragraphs 1 through 60, as if fully set forth herein.

62. This is an action for fraud and intentional misrepresentations against the Defendants for false and intentionally misleading statements upon which the Plaintiffs relied to their detriment.

63. Starting in March 2011, the Defendants knowingly and deliberately concealed true facts concerning the purchase of the Friar Tuck Inn, the repairs needed to be made to the Inn and the efficacy of the checks produced in discovery in the lawsuit in the State Action.

64. The Defendants made these false statements in an effort to defraud and steal funds from the Plaintiffs.

65.     The Plaintiffs reasonably relied on the Defendants' material misrepresentations and omissions to its detriment by parting with at least $5 million.

66.     At the time of these material misrepresentations and omissions, the Plaintiffs were unaware of the true facts, which the Defendants suppressed and failed to disclose to the Plaintiffs.

67.     The Defendants' conduct was willful and malicious in that it was intended to cause injury to the Plaintiffs and was perpetrated with conscious disregard for the Plaintiffs, thereby warranting an assessment of exemplary and punitive damages in an amount appropriate to punish the Defendants.

WHEREFORE, the Plaintiffs demand judgment against each of the Defendants, jointly and severally, and in its favor for:

    A.  Compensatory and other damages contemplated by and available for damages actually sustained in the amount of at least $5,000,000;

    B.  Punitive damages; and

    C.  Such other relief as the Court deems just.

Dated:  New York, New York
         April 19, 2018

**DORSEY & WHITNEY LLP**

By:  _/s/ Nathaniel H. Akerman_
        Nathaniel H. Akerman
        Geoffrey Sant
        Michelle Ng
        Carol Lee

51 West 52nd Street
New York, New York 10019
(212) 415-9200